Okay, Ms. Buckle, would you like to come up? We will get started when you're ready. May it please the court. Good morning, your honors. I'm Nichole Buckle, and I, along with my co-counsel Vicky Warner, represent the plaintiff appellant Donald Mitchell. This morning I will be addressing the issue of whether Nassar applies to 1981 claims, and my co-counsel will be addressing the factual issues that arise in this matter. To begin with, Nassar only applies to Title VII claims. There is no, the plaintiff under Nassar did not file a claim under 1991. It was not addressed at all. Let me just tell you what bothers me is, I have trouble seeing that your client engaged in protected activity. You know, that's one of the elements of the claim, that he engaged in protected activity in order to state a retaliation case. That's the case you have before us, is retaliation. Is that, do you agree? That's correct, your honor. And what's the protected action? Your honor, if I may defer to my co-counsel, I think she would be better. You know, that's the problem with dividing up an argument. I don't think that's the issue in the case, but go ahead. Your honor, I believe. And if it doesn't, it doesn't matter whether Nassar applies to 1981 if your client didn't engage in protected activity, right? That's correct, your honor. Now, what evidence is there that anybody knew he was the author of the anonymous letter? Your honor, again, if I may allow my co-counsel to comment. What are you going to talk about? I would like to talk about the applicability of Nassar to 1981. I believe that this case needs to address Nassar. I don't think that needs nine minutes of time, to be honest with you, but go ahead, because I don't think it matters. But go ahead. Your honor, I respectfully disagree. I think that Nassar is, the circuits in the district courts are split on . . . Oh, it could matter in some case. I just don't think it matters in this one, but go ahead and tell us why you think Nassar doesn't apply to 1981. Well, your honor, as I began saying, the court in Nassar focused on the word because. That's simply not in the language of 1981. 1981 is a very broad statute. I don't believe there's any dispute that the motivating factor applies to discrimination claims under 1981, and there's simply nothing in the language of 1981 that allows retaliation claims to be divorced from discrimination claims. I believe that Justice Ginsburg's dissent should be adopted by this court when it comes to 1981 claims. The courts have long held that retaliation is a manifestation of discrimination claims. Modern tort law permits plaintiffs to prevail upon multiple causative issues, and there's no reason to upset years of precedent that have applied the motivating factor standard. I would refer the court to Edwards v. Jewish Hospital. It's out of the Eighth Circuit from 1988. It was before Pricewaterhouse in which the court applied the motivating factor standard. There are multiple differences between 1981 and Title VII. The courts have recognized that it's an independent and separate action, and they are allowed to have differing standards. The cases that have addressed Nassar in the context of other claims such as the FMLA, Title IX, First Amendment, and even state law claims that are similar to 1981, all of the courts that have actually analyzed the issue have recognized that Nassar does not apply and the motivating factor standard should still apply. None of the cases cited by the Eppley or even the district court in this matter are binding, and there was no analysis on whether Nassar applied to 1981, so I don't believe there's any persuasive effect either. This court in Smith v. Xerox, which addressed the motivating factor standard under Title VII, said that we're bound by circuit precedent, and I believe that this court is also bound to continue applying the motivating factor standard, and if I may, I'll refer the rest of my time to my co-counsel. Okay. Thank you, Ms. Bogle. Good morning, Your Honors. My name is Vicki Warner, and I'm also counsel for Title VII. Good morning. Tell us—explain to us what protective action— The protected activity that Mr. Mitchell engaged in was he wrote an anonymous letter to corporate home office in Washington State complaining—it's a race-based letter—complaining of the tolerance of racial slurs and jokes in the workplace by the plant manager, Mr. Story, and the apparent, to our client, inconsistency in the application of the no-tolerance policy of Weyerhaeuser. Mr. Mitchell wrote this anonymous letter— What evidence is there that anybody knew he wrote it? Okay. There is circumstantial evidence that, well, certainly Weyerhaeuser knew there was a complaint against Mr. Story, who was the Natchitoches plant manager. How many people worked in that plant? Approximately, I believe, 100 to 200 employees, I believe. So if there is a 1 in 200 chance or 100 chance that it was Mr. Mitchell, I don't think that's good enough. That's correct, Your Honor. What's good enough? Well, you have to look at the totality of the evidence. You have to look at the timing of things. Mr.—the co-employee told the race-based joke that fostered the anonymous letter in or around October of 2008. I'm sorry. Wasn't the anonymous letter just about that one joke? I mean, was it about some long-involved pattern of racial discrimination? It mentioned that one joke. You are correct. But it also mentioned other perceived impermissible actions by the plant manager, such as— One racial joke and one homosexual joke. A homosexual comment. And that's it. And that's correct. And again, I'm not saying that that's good. I mean, that's terrible. But we know that neither 1981 nor Title VII is a general civility code. And so you still have to be complaining about something that at least arguably is a violation of one of those two. And how is one racist joke or one homosexual joke, while reprehensible and terrible, and I wouldn't do it, and I would condemn it strongly, how is that a violation of either one of those? We just submit, Your Honor, that it is in the circumstances of this case. Mr. Daryl Jackson, who told the racist joke, used the N-word, talked about throwing them down a well, and drew a drawing with a cross on the top of it. And there was—this little paper mill, this little plant in Natchitoches, is a hotbed of gossip and talk. And so it got around that Mr. Jackson told this remark to people. And Mr. Mitchell, my client, was—he heard this and he was astonished because he had personally observed this same plant manager fire another employee, an African-American employee, on the spot, who had called another employee the N-word on the floor of the plant. He had seen—he had relied upon Mr. Story's promises when he came to work there that he was going to enforce the no-tolerance policy. He saw Mr. Story do that when this other employee used the N-word. Then he learned that Mr. Daryl Jackson had made this racist joke, and there were both whites and blacks in the plant who were perturbed about this. How many people heard the joke? I think approximately four. It was in an office of supervisors. My client was also a supervisor, but he did not happen to be in the office at the time that joke was told. So it upset him that that was going on, coupled with his knowledge of Mr. Story's use of the homosexual slur in another conversation and with his knowledge of Mr. Story's bullying and intimidating tactics with his own crew, which arguably, I suppose, that may not fall within the protected activity range. But the letter was primarily a race-based letter and prompted Weyerhaeuser to send high-level corporate executives there and conduct an investigation. But all we're here for today, correct me if I'm wrong, is the retaliation. That's correct. All right, and what's the nexus? The causal link? Well, you have to look at the totality of everything. The timing, you have to look at the fact that my client was a 13-year employee in this plant, was a salaried manager, had never had any ---- How many others in this reduction in force were terminated when he was? On his level as a salaried manager, there were three others in our client. And a total of 25, right? Somewhere in that range. I'm not sure whether 25 salaried people were terminated. No, but I mean in this ---- There were. There were. You're basically saying this reduction in force where they fired like 25 people with some kind of ruse to discriminate against Mr. Mitchell for filing this anonymous letter that there's no evidence anyone knew he sent. But Mr. Story, the circumstances of Mr. Story's reaction to the ---- Mr. Story learned there had been an anonymous letter sent. At about the same time he learned that, he knew that one of Mitchell's crew had stood up in a meeting with high-level corporate executives and had complained about Mr. Story. He called Mr. Mitchell in and said, I heard one of your crew members was saying stuff about me. You know, go check this out. And my client perceived that as he was supposed to go discipline this crew member. And he felt that it was a closed meeting with high-level corporate executives, that they opened the floor for comment, and that he, Mr. Mitchell, might be open to a retaliation claim by his crew member if he disciplined her for speaking out as she had been encouraged to do. So Mr. Story, I forgot your question, I'm sorry. But Mr. Story perceived, we believe a jury should decide whether Mr. Story, his knowledge of the anonymous letter, his knowledge that Donald Mitchell was not going to discipline a crew member who complained, made some of the same complaints in the open floor meeting that Mr. Mitchell had mentioned in the anonymous letter. You know, those kinds of things, we believe there is sufficient circumstantial evidence to let the jury decide whether Mr. Story knew or should have known or whether Mr. Benefield— In my memory of the facts in this case, and we've had several, you know, a lot of cases, but wasn't he the least highly rated of the managers that were terminated in this reduction in force? He was the least highly rated on the spreadsheet that was drawn up without any basic criteria or— But your argument basically is this firing of 25 people in this plant was a ruse to discriminate against your guy, and that's— My guy's position was— That seems to strain—I love juries and I love giving them questions to answer, but that seems to strain that. My guy's position was not eliminated. Another employee from another plant was brought in to fill his spot. A true reduction in force would— Did they go from 200 people to 175? That's a reduction in force. The fact that somebody else has to now take on extra work or reshuffle or whatever, you still reduced your force from 200 to 175. Did that happen or did that not? We believe they did reduce the force. They reduced the hourly— That's generally considered a valid thing, even though people get hurt along the way, and it's very unfortunate. I'm very sorry when people lose their job, but that is a very common thing. The announcement that there was going to be a reduction in force— Oh, I see I have a red light. You can answer the question. Yes, sir. Go ahead. Go ahead. Oh, the announcement that there was going to be a reduction in force of salaried people was that there were going to be three salaried supervisors laid off. But as it turned out, four salaried supervisors were laid off, not three. And not all of the salaried supervisors were evaluated in the lab. But my point of my previous question is if they reduced from— or increased or reduced, either way you want to look at it, four to three, because he was the least highly rated, wouldn't he be among the expected candidates? You could say that. However, his failing of the year-end evaluation on the very same day that Mr. Story was told he had to fire the guy who had told the race-based joke and Mr. Story was placed on a performance improvement plan and, oh, by the way, you're going to have to reduce your force, all of that happened within 24 hours of each other. Mr. Mitchell had never failed a year-end evaluation ever before. But it wasn't Story who made the reduction in force decision. That came from higher up. That came from higher up based upon some orders and numbers that were declining, no question about that. A reduction in force is a legitimate business reason for firing people. We're not denying that. But what we're saying is the way this reduction in force was handled, the jury should decide whether Mr. Mitchell's inclusion in the reduction was, in fact, retaliatory intent. And the retaliatory intent is a jury question, not a matter-of-law question. Thank you. Thank you very much. Mr. Fagan. The protected status question, I agree, is a threshold one which would pre-permit the court from having to address any of the other issues because they would have to reach that threshold under either statute. Judge Drell originally said it was protected to send this anonymous letter. So what is your... He cited a case, a Texas District Court case called Jones. And I distinguished that at the district court level by pointing out that the complaint that was made in that case was grounded in an allegation of sexual discrimination. And, in fact, that's the thread, and that's one of the threads that I suggested in our brief. When you read the cases, and that's what's lacking in this case, but when you read the cases, even the cases cited by the appellants, all of those cases involve an EEOC charge. There is some actual allegation by the complainant of unlawful activity being committed against or involving that complainant. Every one of those cases, I believe, is like that. You can... OK, so you're saying that even if they knew he wrote it, that one allegation of a racist joke, however reprehensible, isn't enough? Is that... That's right. There are actually three different incidents in the anonymous complaint. There is the so-called racist joke, which was made in the presence of three white superintendents. Two were participating, one was listening. The one that overheard it, Johnny McCrory, is a supervisor. He's the one that apparently told others that the joke... That's how it was disseminated. And what the evidence shows is that Mr Storey, who's here in the courtroom, immediately took action with that taking place... Excuse me. He immediately disciplined Daryl Jackson, told him, you're going to do this one more time, you're going to be fired. Later, six weeks later, a new sheriff came into town in terms of the regional manager and canned the guy. He was gone because of that, because she disagreed with what the prior regional manager had done. So that was taken care of lickety-split. But Mr Mitchell was not aware of that, and he's testified to that fact. The other incident... He was not aware of what? He was not aware of the discipline that was imposed by Mr... He assumed, and his testimony is, I assumed... But, I mean, you can engage in protected activity of reporting racial harassment, even if you don't know that maybe it's been addressed. It would still be protective activity to report the racial harassment. To me, the question is whether this even arguably rises to the level of reporting racial harassment, or is it one of those civility code, reprehensible kind of cases that doesn't rise to that? I think it's a joke made in the presence of three... It's a tasteless, poor joke that should not have been made in the presence of three white supervisors that was not directed at anybody in a protected status, and that's the missing link. That's why it's not protected activity. The fact that it was disseminated by one individual does not raise it to the level of protected activity, because the joke was still not directed at somebody who was in a protected status. That's the difference. The other part... And if... I'll move on to the other incident, if you want me to, unless you have any questions about that one. Mitchell wasn't present when the joke was... He was not. He was not present at... In fact, he was not present at any of the incidents described. So he just heard about it second-hand? Exactly. All of this. And the one that involved what's so-called homosexual remark. The other two things that are mentioned in the anonymous letter are both performance-related comments that were made in less than sacrosanct language. One incident was... January 2... It's either in late 2007 or January 2008. There's a meeting of the quality assurance managers, all of whom are male, none of whom are gay. Mr...  All of whom, I think... All of whom were Caucasian, as well. And they were... Mr. Story was asking them about, how can you account for your time? And they can only account when they added up all the time that they were doing for 60% of their hours that they were actually worrying. That's when he made the remark about, what are you doing? Are you engaging in that kind of activity? The homosexual remark that... Or what was perceived as a homosexual remark. Again, nobody in protected status is in the room. Mr. Mitchell's not in the room. It's not a protected activity. That's involved. Nobody was a target in that activity. The last incident, again, was performance-related. It was Mr. Story... This facility constructs... They have one big line that makes huge 80-by-4 feet layered... That's veneer glued together, strips of things that are used for subflooring, basically. And they also make the I-beams that go into houses and buildings and things like that, the crossbeams, the support beams. And so one of the production... And the production crew that was over the big sheets, the 80-by-4 sheets, had a crew meeting. It was Mr. Mitchell's crew. They have 16 to 20 individuals on that crew. And that crew itself was... I think Mr. Story characterized that he was having a scorecard review. This was a regular review of the performance of that crew. This was the lowest of the four performing... This was the lowest performing of the four production crews on the facility. And he was castigating them for that. His testimony was that, well, I hadn't been getting to him before, essentially. I'm paraphrasing. And I wasn't getting to him with nice language. I'm gonna be a little harsh with him. And he was. This is when he says, I don't want to hear any more bitching and whining about the veneer, quality of the veneer. You all are like a cancer to the mill. It's those type of comments that were made. That, to a diverse group of people, including African-Americans, all ethnicities, male and female, is not protected activity. It was not targeted at anybody with protected status. Those are the three incidents that are described in the anonymous complaint, and that's it. And that's why my argument to the district court was that this is not, this anonymous letter, which is just this piece of paper, is not protected activity. Can you give me the record? Yes. Sorry, it's upside down. It's the sealed record page 1078. Sealed record page 1078. Okay, but so your point is, it isn't some pervasive, like they're telling racist jokes all day long and this and that and whatever, in cases we have quite severe conduct alleged. So even if he'd signed his name to it, you're saying that wouldn't have been enough to state a case for retaliation. Anonymous or not. What evidence is there that they knew it was him? So let's say for a moment that it was in fact protected activity. What evidence is there that they knew it was him? There is no evidence. They being, I guess, story, the decision. There is no evidence that they, and let me define who they are. There were three, because I think the question of the they is who were the decision makers or who were involved in the decision-making process that was ultimately led to his termination. That's Mr. Story, Steve Story, who was the plant manager, Greg Gordon, who was the assistant plant manager, essentially, and Billy Benefield, who was the human resources manager for the facility. Those were the three that... Where did Janice Adams fit in? I was going to add to her. Janice Adams is the regional human resources. So she oversees several plants, including the Natchitoches facility. And so her role in that was also to set up the matrix, set up the system that they used to identify... It's actually 45 individuals, 45 hourly employees and four production supervisors. So it was a 25% reduction of 200, roughly. Was she the only one that designated Mitchell as to be among those? No. There are two aspects to that. Number... The first thing, this complaint, this anonymous complaint, did lead to an investigation. The upshot of that investigation was Jan Mars, who is the operations side of the regional management. So Steve Story reports to Jan Mars. She's operational. Janice Adams is an adjunct. Adams and Mars are on the telephone and tell Story that we're gonna send somebody down because we think the leadership at this plant is lacking. And so Janice Adams was tasked... And this is very important, I think, for the nature of why, even if we had to go to the McDonnell Douglas burden shifting, there is no proof of pretext at all. But Janice Adams went down and interviewed everyone on the leadership team, excluding, I think, everybody on the leadership team, including the eight production supervisors. She independently gave, without anybody else's input, she independently gave Mr. Mitchell the lowest ranking of any superintendent. She had three categories, and I'm sorry I don't remember them specifically. They're sort of the keep them, they need training, and release them, and don't rehire them. The last one was release them and don't rehire. And Mr. Mitchell was the bottom of that category. So we have somebody who's not on the site, who's not involved in any of the per se investigations. She's not involved in any day-to-day activities coming and doing this. And then a few days later, they went through the reduction of force process for the supervisory people. That's when they did the make-they-Benefield story, and Gordon did the analysis, which was on several different factors. It wasn't just on one thing. And they, again, ranked Mr. Mitchell the lowest performance. So you have two different rankings of him being in the lowest category. So even if you go to the pretext side of the equation, even if you had to consider that, there is absolutely no proof that there's any falsity or, as Judge Haynes put it, ruse to try to target Mr. Mitchell. You know, you're gonna fire 50 people so you can retaliate against Mr. Mitchell seems extraordinary, to say the least. How long had Mitchell worked at the plant? He had actually worked at the plant for the predecessor company to Weyerhaeuser. I think it was 1996, I believe. I mean, had his rankings, his ratings been consistently low? No, no, they had not. When did they start dropping off? Mr. Stewart, I don't think we have the complete records going back to the beginning of his career. He had, there are several different rankings. This year was the first year that he had a below ranking for the records that we have available for him. He was listed as 65% achieved ranking in his end of year and 35% below, but he was given an overall rating of below. And there were five different factors, and this is another thing if you want to go to the pretext side of the equation. There were five different factors that Mr. Storey described as being the basis for this that were really, that are not addressed in the briefs on appeal. That's really not opposed in terms of him meeting, there were a certain number of projects he had to do, and principally the reasons that he got the below rating were because his crew continued to have these festering problems and performance issues and production issues that continued through the year. These are objective tests. Pardon me? These are objective tests. In other words, you're supposed to put out ten widgets and you put out eight. Some of it's objective. A lot of it, it's what they call fall down, because these machines press the veneer. They press, I don't know how many sheets of veneer together, but they're a lot. And if you mess up doing that, you've got to throw the whole business away. That's what the fall down is. And so his crew had the highest fall down rate. That's objective though. Pardon? Yes, that is an objective factor. That was one of the objective factors. Do you want to address the Nassar issue? I can, if you like. I mean, I just feel since your opponents felt that they had that much time that you ought to address it. Can I point out a couple things on the protected status issue before we move on? Just there's a new case that this court came out, not a different panel, and it is persuasive because it's not presidential but about two weeks ago that makes the point that I think I'm making about the underlying conduct needing to involve some unlawful discriminatory or harassing activity. It's a case called Young Busson, B-U-I-S-S-O-N, versus Board of Supervisors of the Louisiana Community and Technical College System. It's Delgado. And it's Fifth Circuit docket number 13-31269. It was decided on November 10, 2014. And there is a very brief discussion on the retaliation but the upshot is that the court dismissed because there was no finding that the underlying activity involved any kind of unlawful conduct. It said something why I thought it would be useful to point out. It says that she reported some of the police's annoying behavior to Dean Gruber. However, there is no evidence that she indicated that these otherwise non-race based incidents were motivated by race or national origin. So I think that's along the lines of the questioning we're having here about the deficiencies and why this anonymous complaint is not that. In fact, the cases that the other side points out make that same point. Every one of the cases that they cite in their brief when you read and drill into them which would include the Kwan v. Andelec case out of the Second Circuit, the Miranda v. Deloitte case which is the District Court of Puerto Rico and the Alexander v. MedPoint case for the Northern District of Mississippi and finally the Smith or Kearney v. Tower Automotive case out of the Southern District of Mississippi. All those are cited in their brief. Every one of them has an EEOC charge, an EEOC charge for some sexual discrimination complaint, some internal complaint that's been involved that involves some unlawful activity and then the retaliation claim arose out of that. So that's the common threat. The Nassar case in terms of the 1981 v. Title 7 application, I think that this circuit has long followed the notion that the standards for retaliation under 1981 and Title 7 have always been the same and there is no rational reason for a different standard to be used for one and to the other and that has been the law of this circuit for at least 30 years in terms of the cases that I'm aware of. I'm sure it's longer than that. Perhaps even dating back to whenever the first retaliation statutes were enacted. But that's the principal reason. So when the Supreme Court came out and decided that the because of language in connection with Title 7 retaliation claims means that the but-for standard of causation applies that by analogy should be applied and has to be I think applied for consistency unless you're going to upset the long-standing precedent of this circuit and of the United States Supreme Court which has treated both of those claims in the same burden of proof. So I think that's the fundamental underlying thing. The FMLA, the Equal Pay Act case that they cite, those are different statutes. It's not a Title 7 based statute. I think the court knows that even those statutes are in some respects have different standards than Title 7 itself. FMLA differences in the way the statutes are worded. So because this is 1981 and another reason why it's applicable because 1981 is a race-based statute in this regard and by the same token, Title 7 specifically has race-based claims that are actionable under that statute. So the same standards of proof should apply and there's no reason to change that precedent. The other side has not cited any cases that say that and I think when you closely examine the cases that they actually do cite, they do apply the same standards of proof. I would direct the court's attention to I think one of the important things is we have some stipulations in this case where a lot of the facts that are material to the issues before the court,      way      facts are clear and the legislation is clear and the statute is clear and the statute is clear and the courts have routinely been generous with finding protected activity in anonymous letters, in calls to hotlines, in memos, in various activities where the courts found that it was reasonable for the plaintiffs to believe that the employer was engaging in impermissible protected activities. The employer has to know who it is before he can retaliate obviously. That's right and we believe the facts and the circumstances in this case strongly suggest that the decision makers in this case inferred that Donald Mitchell either wrote the letter or was directly involved in the preparation of the letter based upon the problems with his crew that had been cited. By the way, Donald Mitchell received an exemplary high-achieve year-end evaluation at the end of 2008. Three months later in March of 2009 is when Mr. Story attacks his crew and calls them a cancer on the mill. They did improve their numbers. The documents and the records in the record establish that they did improve their numbers and Mr. Story even complimented them. Your opponent referenced things that had to be thrown out because they weren't properly compressed. Did your client's division have a high number of those? They did for a period of time. But they made improvements in it, especially after Mr. Story spoke to them. Did the record show when this problem with that crew started? You said he'd gotten an exemplary one. He got an exemplary report at the end of 2008, so obviously it would have had to have started at the beginning of 2008. Is there any evidence in the record that it started earlier or didn't start earlier? There is no evidence one way or the other that I'm aware of. It could have happened in those three months. That's correct. And it was corrected and Mr. Story acknowledged that to Mr. Mitchell after it was corrected. So it's not that there was any continued problems on down the way until December of 2009 when he was rated below and when he was terminated in February. But just one more thing, and I don't want to belabor the point too much, but the one incident of race-based problems that was referenced in the letter, let's assume that may be the only thing that is tiable to a claim of retaliation. If that incident is egregious enough, then this court has found that one incident could be. Oh, we're well aware of that. The problem is typically, as he said, if you tell a joke and it's not   not a joke. And to be clear, I personally find it reprehensible and wouldn't tolerate it in my workplace. That's a different question from what the law provides. And I would call the final word, I would call the attention of the court to  case of Willis v. Pleco Corporation, April 2014, Fifth Circuit case in which the retaliation claim survived summary judgment. And this was after Nassar. So whether you go with before Nassar, after Nassar, Title 7, 1981, we offer the argument that the jury should be allowed to decide. Thank you.           Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.                   Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.